UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDRE CAIRO,
    Plaintiff,


    v.                                 CIVIL ACTION NO.
                                       11-11750-DJC

STARBUCKS CORPORATION,
    Defendant.

**REPORT AND RECOMMENDATION RE:
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 19)**


**September 13, 2013**

**BOWLER, U.S.M.J.**

In the case at bar, plaintiff Andre Cairo ("Cairo"), who suffers from a seizure condition, alleges that defendant Starbucks Corporation ("Starbucks") failed to provide him with a reasonable accommodation in the form of a modified work schedule for a temporary, one month time period. In lieu of accommodating his hours within an 8:00 a.m. to 9:00 p.m. time frame, the company terminated his employment as a barista. The two count amended complaint alleges that Starbucks failed to reasonably accommodate Cairo's disability under the American with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), and Massachusetts General Laws chapter 151B, section 4(16) ("chapter 151B").

Starbucks moves for summary judgment on both counts. (Docket Entry # 19). Cairo opposes the motion and, after conducting a hearing, this court took the motion (Docket Entry #

19) under advisement.

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Id.

Facts are viewed in favor of the non-movant, i.e., Cairo.  Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  "Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted."  Davila, 498 F.3d at 12 (internal quotation marks, citation and ellipses omitted); accord Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (if moving party makes preliminary showing,

nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" with respect to each element on which he "would bear the burden of proof at trial") (internal quotation marks and citations omitted).

Defendant submits a LR. 56.1 statement of undisputed facts. Plaintiff admits to a number of the statements of facts and disputes, in whole or in part, a number of other statements. The uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003); Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003). Viewing the record in plaintiff's favor, the facts are as follows.

### FACTUAL BACKGROUND[1]

Plaintiff worked as a barista at a Starbucks retail store at 84 State Street in Boston from October 8, 2009 to February 6, 2009. Baristas who staff retail stores are also known as partners. The job description of a barista sets out a summary of "Key Responsibilities." (Docket Entry # 28-12). These responsibilities "and essential job functions include[,] but are not limited to[,]" acting with integrity and honesty,

---

[1] Citations to the record are provided only for direct quotations.

anticipating customer and store needs, assisting with training of
new partners, contributing to a "positive team environment,"
maintaining a clean workspace, maintaining "regular and
consistent attendance and punctuality," adhering to operational
policies and procedures, delivering "legendary customer service,"
providing quality beverages and recognizing team accomplishments.
(Docket Entry # 28-12).  Cairo describes the duties of a barista
as "[m]aking coffee, preparing coffee, ringing on the register,
open[ing] and closing [the store], cleaning the special machines"
and "changing the coffee every 20 minutes."  (Docket Entry # 22-
1).

Cairo performed his duties as a barista at an acceptable
level during his employment.  He was personable on the job, never
disciplined for attendance issues and often volunteered to work
extra hours for other stores in the Boston area.  Melinda Tam
("Tam"), the store manager, never had "any real problems with
[Cairo]" during his employment at the store.  (Docket Entry # 28-
4).  Although she had more than one "coaching conversation" with
Cairo, she did not consider "him a bad employee."  (Docket Entry
## 22-3, 28-4).  The only coaching conversation she could
remember was when he became "chatty with his co-workers" thereby
causing her to "coach him to be more aware" of the customers.
(Docket Entry # 28-4).

Cairo was unemployed in the two years preceding his October

2008 employment.  He collected Social Security Disability

benefits during this time period because of a bipolar condition,

a post traumatic stress disorder, a "conduct disorder and

depression."[2]  (Docket Entry ## 20 & 28, ¶¶ 20).  In October

2008, Cairo applied to work at the State Street store by walking

into the store and speaking with Ed Batorski ("Batorski"), the

store manager at that time.  Batorski needed an individual who

could regularly work opening shifts and had availability for the

closing shifts.  Cairo told him that he "could work any hours."

(Docket Entry # 22-1) (Docket Entry ## 20 & 28, ¶¶ 22).

At Batorski's suggestion, Cairo attended a job fair at the

State Street store and met Tam, who was due to replace Batorski

as store manager.  Like Batorski, she told Cairo that she needed

someone who could regularly open the store and occasionally close

it.  During the interview, Tam enjoyed her interactions with

Cairo and hired him at the job fair to work as a barista.

"Early in his employment," Cairo completed a "Partner

Information & Availability Agreement Form" ("the availability

form") setting out his preferred hours and his available hours

for a seven day work week.  (Docket Entry ## 20 & 28, ¶¶ 28).

The form sets out his availability to work from 5:45 a.m. "until

close on Monday, Tuesday and Friday; from open until close on

---

[2]  There is no indication that Starbucks was aware of this
condition.  Tam did not ask Cairo about his prior employment
history when she interviewed him for the position.

Sunday; from [10:00 a.m.] until close on Thursday; and from
[11:00 a.m.] until close on Saturday."[3]   (Docket Entry ## 20 &
28, ¶¶ 28) (Docket Entry # 28-3).

The form states that, "[I]n order to be eligible for
employment with Starbucks, hourly partners (baristas and shift
supervisors) must be available to work at least three shifts per
week or 16 hours/week (for weekend-only partners)."   (Docket
Entry # 28-3).   It also contains a note to the store manager that
a full time "partner must be available to work 70%+ of total
store operating hours" and that a part time "partner must be
available to work "150%+ of targeted hours."[4]   (Docket Entry #

---

[3]   The form also contains his preferred hours.

[4]   Jody Barrett ("Barrett"), a Starbucks district manager
who managed the district that included the State Street store,
states by affidavit that Starbucks policy:

> requires that partners must work 32 hours per week and must
> be available for 70% of the open store hours.   For part-time
> employment, the policy requires that partners work a minimum
> of three shifts per week, or, for those who only work on
> weekends, a minimum of 16 hours.   In addition, in order to
> provide store managers with necessary scheduling
> flexibility, part-time partners must indicate an
> availability to work 150% of their target hours.

(Docket Entry # 23).
Cairo disputes this fact.   He points out, correctly, that a
store manager guide applicable to "Optimal Scheduling" at
Starbucks, allows a manager to input the number of minimum and
maximum hours for each full time partner and shift supervisor.
Under the heading "Minimum Hours Work Rules," the guide states
that minimum hours for shift supervisors "will typically be set
to 32" and that "[b]aristas who are full-time should also be set
to 32" but that "[b]aristas working less than 32 hours may have
minimums set for a smaller amount."   The guide therefore

28-3).  Partners are required to update the form every six
months.  Partners, i.e., baristas, may "request to change their
availability within the six-month window, but Starbucks may not
be able to accommodate those schedule changes."  (Docket Entry ##
20 & 28, ¶¶ 15).

"In 2008, Starbucks issued an 'Optimal Scheduling' policy."
(Docket Entry ## 20 & 28, ¶¶ 6).  The policy ("Optimal
Scheduling") was in effect at the time of Cairo's employment.
Optimal Scheduling sets "forth minimum working hour thresholds
and availability requirements for full-time and part-time
employment."  (Docket Entry ## 20 & 28, ¶¶ 6).  Starbucks
introduced the policy "in part, due to partners' requests for
more hours and stable schedules."  (Docket Entry ## 20 & 28, ¶¶
6).  The company anticipated that the policy would improve the
work environment for partners and thereby reduce turnover and
enhance the experience of customers.  Tam describes the system as
"pretty flexible" and Starbucks prides itself "in offering
partners flexible hours."  (Docket Entry ## 28-4, 28-14).

As part of Optimal Scheduling, each store uses a computer
system.  The store manager inputs opening and closing hours for
the store as well as the hours of availability of each barista.
Starbucks tracks the number of "transactions per hour or per half

---

recognizes that managers may set minimum hours for baristas who
work less than 32 hours a week.

hour" at a store (Docket Entry # 22-4) and the computer system takes into account staffing needs based on the store's "history and manager input."  (Docket Entry ## 20 & 28, ¶¶ 13).  The system thus considers both "the hours that a store is open and the volume of sales in that store."  (Docket Entry ## 20 & 28, ¶¶ 16).  After inputting the data, the system produces a schedule for the week which takes into account each partner's availability and the needs of the particular store.[5]

The previously mentioned store manager guide outlines the mechanics and the options for building a schedule under Optimal Scheduling.  (Docket Entry # 28-2).  It instructs managers how to set and input minimum and maximum hours for partners.  The thresholds for a barista's minimum work hours are typically set at 32 hours even though his or her availability form shows a higher number.[6]  The computer system also allows a store manger to set maximum hours "for partners that are truly limited in the number of hours they can work."  (Docket Entry # 28-2).

The guide additionally advises managers how to "restrict availabilities as necessary to promote schedule stability." (Docket Entry # 28-2).  The guide notes that such a restriction "might typically be done for partners with open availability to

---

[5]  The guide refers to "building your schedule each week" (Docket Entry # 28-2) and the system itself "trends over a six-week period of time" (Docket Entry # 22-4).

[6]  See fn. 4.

8

set them into general dayparts" and that it "can be useful in
keeping a team of partners together to work primarily mornings."
(Docket Entry # 28-2).  The guide discourages the practice,
however, because it "may result in understaffing the schedule,
and partners not getting their targeted hours."  (Docket Entry #
28-2).  In fact, it recommends restricting partner availability
"only as absolutely necessary to force general stability."
(Docket Entry # 28-2).

The guide sets out two methods to create a schedule.  Both
methods begin by bringing forward a schedule for a previous week
that the manager desires to replicate.  Under the first method,
the manager will edit the imported schedule.  This method is used
when there are few changes and it cannot be used if "partner
availability has changed."  (Docket Entry # 28-2).

Under the second method, referred to as "Bring Assignments
Forward, Fix and Calculate," a manager will fix and calculate a
new schedule.  The guide advises store managers to use this
method "when changes in business activity or partner availability
are significant, but most of [the manager's] core team is
unchanged."  (Docket Entry # 28-2).  The first step instructs the
manager to "[s]elect partners on [a] core team that you want to
be unchanged" and to "fix shifts for these partners," which will
"lock them in place."  (Docket Entry # 28-2).  The computer
system then "build[s] an optimized schedule around that fixed

framework that best matches business and partner need for partners whose shifts were not fixed in place."[7]   (Docket Entry # 28-2).

"It is Starbucks' practice to terminate partners who are unable to meet the minimum requirements of Optimal Scheduling." (Docket Entry ## 20 & 28, ¶¶ 10) (Docket Entry # 23, ¶ 7).   Even if a partner meets "the technical requirements of Optimal Scheduling," it "is not always indicative of sufficient availability to remain employed at Starbucks."   (Docket Entry ## 20 & 28, ¶¶ 11).   Thus, "it is also Starbucks' practice to terminate partners whose available hours do not meet the business needs of the store in which they are employed."   (Docket Entry ## 20 & 28, ¶¶ 11).   Tam terminated Cairo's employment primarily due to his lack of availability to open or close the store.   (Docket Entry ## 22-3, 28-13).

The shifts available at each store varied "from week to week."   (Docket Entry ## 20 & 28, ¶¶ 16).   The shifts at the State Street store during Cairo's employment consisted of an opening shift, a midday shift and a closing shift.   (Docket Entry ## 20 & 28, ¶¶ 30, 31).   The opening shift began at 5:45 a.m., 15 minutes before the store opened to the public.   The store closed to the public at 8:30 p.m. and the "baristas working the closing

---

[7]   The computer systems additionally permits a store manager to create a schedule from scratch "[w]hen there have been too many changes to partner availability."   (Docket Entry # 28-2).

shift stayed until 9:15 p.m."  (Docket Entry # 20 & 28, ¶¶ 32).

There were "a few" midday shifts and they "typically began between" 7:00 a.m. and 7:30 a.m.  (Docket Entry # 28-4, p. 71) (Docket Entry ## 20 & 28, ¶¶ 31).  Although 8:00 a.m. is not a normal time to start a midday shift, Tam testified that "there may have been times where maybe some of [the midday shifts] started at" 8:00 a.m.  (Docket Entry ## 22-1, 28-4).  During his deposition, Cairo testified that the midday shift started at 11:00 a.m. or 10:30 a.m.[8]  (Docket Entry # 22-1, p. 79).  Cairo did not work the midday shifts at the State Street store because those shifts belonged to two senior baristas at the store.

Shift times varied depending on "a lot of factors" including partner availability and business needs of the store.  (Docket Entry # 28-4, pp. 71-73).  The busiest times at the store were 7:00 a.m. until 9:30 a.m. and 2:00 p.m. until 4:00 p.m.  (Docket Entry ## 20 & 28, ¶¶ 33).  Tam usually had three partners open the store and scheduled either two or three baristas to close the store.

"Cairo typically worked opening shifts" and less frequently the closing shifts.  (Docket Entry ## 20 & 28, ¶¶ 34).  He also worked at other Starbucks stores, including the Winter Street and Boylston Street stores, when there was an opening.  Cairo

---

[8]  This testimony is consistent with his affidavit testimony that, "Mid-day shifts generally started at approximately 11 a.m. and ended between 4:00 and 5:00 p.m."  (Docket Entry # 28-6).

testified that these stores "would always have opening shifts" and that Tam "routinely" informed him about shift openings at other Starbucks stores.  (Docket Entry # 28-5, pp. 53-54) (Docket Entry # 22-1, p. 57).

On or about January 15, 2009, Cairo suffered a grand mal seizure.[9]  He was not at work at the time.  He was hospitalized for three days and in a comma for approximately two days.  One of his doctors at the hospital told Cairo "that he had the seizure because he was overly stressed."[10]  (Docket Entry # 28-5, pp. 53-54).  While at the hospital, "doctors told Cairo that he should not return to work for a month."  (Docket Entry ## 20 & 28, ¶¶ 46).  During his hospitalization, he did not show up for at least one scheduled shift at the State Street store and he did not notify Tam about this absence.

Cairo telephoned and spoke to Tam from the hospital.  "She told him to get well, and he told her that he would return to work as soon as he could."  (Docket Entry ## 20 & 28, ¶¶ 45).

---

[9]  Cairo had his first seizure in 2002 or 2003.  He does not have epilepsy and the cause of the seizures remains undiagnosed. He has taken medication to treat the disorder.  For purposes of the summary judgment motion, Starbucks assumes that Cairo is disabled within the meaning of the ADA and chapter 151B.

[10]  Cairo's "sources of stress at the time of the seizure included long work hours, trying to assist his uncle who had cerebral palsy, and his" son's "mother purposefully burning their son with hot coffee."  (Docket Entry ## 20 & 28, ¶¶ 44). There is no indication that Cairo informed Tam about these sources of stress.

After his release from the hospital, Cairo went to the store and spoke with Tam.  She advised him "he would need a doctor's note to return to work."  (Docket Entry ## 20 & 28, ¶¶ 48).  Cairo therefore went to see Herbert Dreyer, M.D. ("Dr. Dreyer"), his primary care doctor.

At first, Dr. Dreyer "told Cairo that he should not work for a month" because "he might have a seizure if he did not have a good night of sleep."  (Docket Entry ## 20 & 28, ¶¶ 51).  Cairo explained that he needed to work because he needed the money.  Dr. Dreyer therefore "agreed to allow Cairo to return to work but told Cairo that he needed to get at least 12 hours of sleep each day."  (Docket Entry ## 20 & 28, ¶¶ 51).

He also gave Cairo a note.  The note states that Cairo "may return to work on" January 27, 2009, subject to the restriction that he needed to work between 8:00 a.m. and 9:00 p.m.[11]  On January 26, 2009, Cairo returned to the store and showed the note to Tam.  (Docket Entry # 28-6, ¶ 7) (Docket Entry ## 20 & 28, ¶¶ 52).  He also told her at that point in time that "he was prone to seizures."  (Docket Entry ## 20 & 28, ¶¶ 52).  After Cairo informed Tam of these restricted hours, she replied "that there was only one shift that met the restrictions and that it belonged to the two senior baristas in the store."  (Docket Entry ## 20 &

---

[11]   The note includes a second restriction to avoid lifting or pushing objects that weigh 50 pounds or greater.

28, ¶¶ 52).  "Cairo understood that there was no room for additional baristas on the midday shift."  (Docket Entry ## 20 & 28, ¶¶ 54).

Although he believed it was a "little bit" unfair for these two senior baristas to have the midday shift, Cairo "had no choice but to accept it."  (Docket Entry # 21-1, p. 86).  He did not ask Tam to bump one of these baristas to make an opening for him and he did not ask "Tam or anyone else at Starbucks for a leave of absence."  (Docket Entry ## 20 & 28, ¶¶ 64) (Docket Entry # 22-1, p. 86).  He did however tell her "that the restrictions were temporary" and that he "should be able to return to full availability in one month pending approval" by his physician.  (Docket Entry # 28-6, ¶¶ 7-9) (Docket Entry ## 20 & 28, ¶¶ 58).  The note has a space for Dr. Dreyer to state the return to work date and it was blank.[12]

During this same meeting, Cairo told "Tam that he might be able to work the closing shift because the extra time after 9:00 [p.m.] was minimal."  (Docket Entry ## 20 & 28, ¶¶ 55).  She then told him "that if he was able to get a new note adjusting the restrictions, she would be willing to schedule him for that time."  (Docket Entry ## 20 & 28, ¶¶ 55).  Cairo told her "he

---

[12]  Dr. Dreyer testified by deposition that when he "intended restrictions to be temporary, his practice was to indicate the temporary nature of such restrictions in the note." (Docket Entry ## 20 & 28, ¶¶ 60).

would ask his doctor if he could adjust his restrictions."
(Docket Entry ## 20 & 28, ¶¶ 56).  In essence, Tam asked Cairo to
get two things from his doctor, "documentation that this was
temporary" and a change in the hours he could work.  (Docket
Entry # 22-1, p. 90).

After the meeting, Tam contacted Barrett and the two
discussed the possibility of finding hours at another Starbucks
store.  Barrett came to the conclusion that "most of the stores
were overstaffed."[13]  (Docket Entry # 28-4, p. 68).  Barrett
advised Tam that, unless Cairo's availability changed, Tam "would
have to let him go."  (Docket Entry # 28-4, p. 68).

In an attempt to find additional hours for Cairo, Tam
contacted four stores nearby the State Street store.  The four
stores included the Winter Street store, where Cairo had worked a
number of shifts.[14]  Of these four stores, only the Washington
Street store closed before 9:00 p.m.  The Berkeley and Boylston
stores had midday shifts but Tam did not contact these stores.
Starbucks has approximately 44 stores in the Boston area.
(Docket Entry # 28-11).  Tam posited that the majority of stores
in Boston did not have extra hours for Cairo because "she knew

---

[13]  Starbucks' Partner Guide provides that a partner's
request for a transfer must be approved by the store manager and
the district manager.  (Docket Entry # 22-3).  Cairo did not make
a request to transfer to another store.

[14]  The other stores were "Government Center, School Street
[and] Washington Street."  (Docket Entry # 28-4).

from chatting" or "contact with most of the managers in downtown Boston" that "everybody was going through a pretty tough time with earning labor."  (Docket Entry # 28-4).

The store schedule reflects that Cairo worked an 8:00 a.m. to 4:37 p.m. shift on January 30, 2009.  The schedule also evidences that he worked from 8:00 a.m. to 9:00 a.m. on February 6, 2009.  This time period corresponds with Cairo's testimony that Tam scheduled him for a shift she created for him which began at 8:00 a.m.  He experienced dizziness within approximately 30 minutes after starting the shift and was told to go home.

At or around this time period, Cairo had a conversation with Dr. Dreyer who refused to alter the work schedule restriction in the note.  On February 6, 2009, Cairo met with Tam and Peter Steel, the assistant manager at the store at that time.  Tam asked Cairo if he had obtained another note from his doctor altering "the restrictions described in" the January 26, 2009 note, i.e., the restrictions as to his work hours and lifting capacity.  (Docket Entry # 21-1, p. 88) (Docket Entry # 28-6). Cairo told Tam that he was unable to get the restrictions in the note altered.  (Docket Entry # 21-1, p. 88) (Docket Entry # 28-6).  Tam then told Cairo he was fired.  Cairo pleaded for his job and again told Tam that the restrictions were temporary.  She refused to change her mind, told him he could reapply if the store got more business or his availability changed and wished

16

him the best of luck in his future endeavors.[15]  She explained
her reason as due to his inability to work the hours for which he
was hired and that she did not have hours that fit within his
availability.

Starbucks has a policy that a store "manager should contact
partner resources if an employee needs an accommodation due to a
disability."  (Docket Entry # 28-4, p. 85).  Tam did not contact
partner resources before terminating Cairo's employment.

After terminating Cairo, Tam did not hire a replacement
barista.  Business was slower and she was able to change and
extend schedules rather than hire a replacement.

Two months before Cairo's termination, Starbucks terminated
a partner who was not disabled at the State Street store "for
inadequate availability."  (Docket Entry ## 20 & 28, ¶¶ 70).
"Within one month of Cairo's termination, four other non-disabled
partners were terminated for lack of availability within the
district."  (Docket Entry ## 20 & 28, ¶¶ 71).

One month after the February 6, 2009 termination, Cairo
consulted with Dr. Dreyer and he lifted the restrictions on when
Cairo could work and how much he could lift.  Cairo began
collecting social security disability insurance after his
termination.  (Docket Entry ## 20 & 28, ¶¶ 69).

---

[15]   These facts are disputed and are made only for purposes
of resolving the summary judgment motion.  They do not constitute
facts determined under Rule 56(g), Fed. R. Civ. P.

Notably, Tam testified that she had baristas on staff during the time of Cairo's employment that could not open or close the store because their availability prevented them from working those hours.  These baristas were nevertheless "still able to do everything that you would expect a barista to be able to do," according to Tam.  (Docket Entry # 28-4, p. 97).  Tam also agreed that, "Just because someone can't open and close a store doesn't mean that they can't be a barista."  (Docket Entry # 28-4, p. 97).

## DISCUSSION

Starbucks moves for summary judgment on the ADA and the chapter 151B claims because it did not fail to reasonably accommodate Cairo and it did not terminate his employment because of his disability.  Cairo argues that he could perform all the essential functions of his job and, in any event, opening and closing the store was not such a function.  He also submits that Starbucks could have provided a reasonable accommodation by modifying his schedule under Optimal Scheduling.

The analysis of the ADA claim and the chapter 151B claim proceeds under a similar framework.  See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012) ("we analyze [reasonable accommodation] claims under the ADA and under Massachusetts General Laws chapter 151B using the same framework"); Sensing v. Outback Steakhouse of Fla., L.L.C., 575

F.3d 145, 154 (1st Cir. 2009) ("federal case law construing the
ADA should be followed in interpreting the Massachusetts
disability law").  Although in certain respects a chapter 151B
claim is more difficult to establish than an ADA claim, see
Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1063
(Mass. 2002), this case does not implicate these distinctions.

I.  Reasonable Accommodation

In order to establish a discrimination claim under the ADA,
"the plaintiff must show that he (1) is disabled within the
meaning of the ADA; (2) is qualified to perform the essential
functions of his job with or without a reasonable accommodation;
and (3) was discharged or otherwise adversely affected in whole
or in part because of his disability."  Jones v. Nationwide Life
Ins. Co., 696 F.3d at 86; accord Russell v. Cooley Dickinson
Hosp., Inc., 772 N.E.2d at 1060; see Richardson v. Friendly Ice
Cream Corp., 594 F.3d 69, 74 (1st Cir. 2010).  For present
purposes, Starbucks assumes that Cairo's seizure condition is a
disability within the meaning of the ADA and chapter 151B and
seeks summary judgment with respect to the second and third
elements.

A qualified individual under the ADA is a person who is
"'able to perform the essential functions of'" his position
"'with or without reasonable accommodation.'"  Phelps v. Optima
Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001) (quoting Ward v.

Mass. Health Research Inst., Inc., 209 F.3d 29, 32-33 (1st Cir. 2000)).  The inquiry is often divided "into two steps:  (1) whether the employee could perform the essential functions of the job; [and] (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions."  Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d at 33; Phelps v. Optima Health, Inc., 251 F.3d at 25.

    A.  Essential Functions

Starbucks identifies the essential functions of Cairo's position as being available to work the opening and the closing shifts.  Starbucks submits that it hired Cairo to work these shifts and the restrictions on his hours meant he could no longer perform this essential function.  The company also asserts that compliance with Optimal Scheduling "by having ample availability to work shifts" at the store "was an essential function of Cairo's job."  (Docket Entry # 24).  Barrett avers that full time "partners must work 32 hours per week" and "be available for 70% of the open store hours."  (Docket Entry # 23).

An essential function "is 'fundamental to a position rather than marginal.'"  Richardson v. Friendly Ice Cream Corp., 594 F.3d at 74; 29 C.F.R. § 1630.2(n)(1) ("the term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires").  Whereas an essential function "does not include marginal tasks,"

it "may encompass individual or idiosyncratic characteristics of the job." Jones v. Nationwide Life Ins. Co., 696 F.3d at 88 (internal quotations marks and citations omitted).  Three nonexclusive reasons why a job function is essential are that: "(1) the position exists for the purpose of performing the function; (2) there are a limited number of employees among whom responsibility for the function can be distributed; and/or (3) the function is highly specialized and the incumbent was hired for his or her expertise or ability to perform it." Richardson v. Friendly Ice Cream Corp., 594 F.3d at 75 (citing ADA implementing regulation 29 C.F.R. § 1630.2(n)(2)).

The summary judgment record undeniably supports the finding that Cairo's job existed for the purpose of having a partner that could open the store and, to a lesser degree, close the store. Tam hired Cairo for these shifts and both Batorski and Tam needed a partner who could open the store on a regular basis and close the store when needed.  The first and third reasons thus favor Starbucks' characterization of the ability to open and close the store as an essential function of Cairo's job.  As to the second reason, however, the store had other baristas who could work the opening shifts as evidenced by the fact that Tam did not hire a replacement barista after terminating Cairo.  Instead, she extended and changed the schedules of existing partners.

In addition to these reasons, the implementing regulations

21

identify the types of evidence that bear upon the determination of whether a particular function is essential.  29 C.F.R. § 1630.2(n)(3); see Richardson v. Friendly Ice Cream Corp., 594 F.3d at 75-76 (quoting 29 C.F.R. § 1630.2(n)(3)).  A court may therefore examine "'"[t]he employer's judgment as to which functions are essential"; "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; "[t]he work experience of past incumbents in the job"; and "[t]he current work experience of incumbents in similar jobs."'"  Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006), with internal brackets omitted) (quoting 29 C.F.R. § 1630.2(n)(3)).  "The consequences of not requiring the incumbent to perform the function" also provide evidence of an essential function.  29 C.F.R. § 1630.2(n)(3)(iv).

With respect to the first item in this nonexclusive list, an "employer's good faith view of what a job entails" is important although "not dispositive" in the calculus.  Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002); see Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d at 34 ("[w]hile we generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus, it is only one factor in the analysis") (citation omitted).  The evidence of Starbucks' view is somewhat

equivocal.  Tam's testimony that, "Just because someone can't
open and close a store doesn't mean that they can't be a barista"
weakens her other testimony about the importance of availability
to work the opening and the closing shifts.

In addition, nowhere does the job description of a barista
mention the need to work certain shifts.  See generally Jones v.
Walgreen Co., 679 F.3d at 14 (beginning essential function
inquiry with job description because statutory and regulatory
framework accord "significant degree of deference to an
employer's own business judgment regarding which functions are
essential"); 42 U.S.C. § 12111(8); Richardson v. Friendly Ice
Cream Corp., 594 F.3d at 76 (quoting 42 U.S.C. § 12111(8)).  At
best, the job description identifies "maintain[ing] regular and
consistent attendance and punctuality" as one of several key
responsibilities.  (Docket Entry # 28-12).  The availability form
also fails to mention working an opening or closing shift as a
mandatory job requirement.

The consequences of not having Cairo work the opening shift
are nevertheless significant to the extent that the morning is
one of the busiest times at the store.  The schedule adjustments
Tam made after Cairo left reduce the strength of this evidence
because she managed to use existing staff to work the purportedly
essential function of Cairo's job to open and to close the store.
Optimal Scheduling fails to mandate availability to work the

opening shift or any particular shift.  Rather, Optimal
Scheduling is a flexible system that encourages shift stability
but does not mandate it.  The facts in the case at bar therefore
distinguish this case from those in <u>Laurin v. Providence Hosp.</u>,
150 F.3d 52, 59 (1st Cir. 1998) (denying accommodation to exempt
nurse from rotating schedule which applied uniformly to all
nurses without exception), a case relied upon by Starbucks.[16]

In light of the foregoing, a reasonable jury could find that
availability for the opening and the closing shifts was not an
essential function of Cairo's job.

As to the requirement of availability for 32 hours and 70%
of weekly opening store hours, Optimal Scheduling does not define
this function as a requirement.  Moreover, the guide simply
reflects that a manager should set minimum work hours of a full
time barista into the computer system as 32 hours.  Barrett's
opinion, while important, is not dispositive.  Again, the written
job description of a barista fails to mention this requirement.
Conversely, the availability form includes a note to the store
manager that a full time partner must be available to work 70% of
the store's total operating hours thus supporting the requirement
as an essential function.  Because the evidence is more equipoise

---

[16]   The other decision relied upon by Starbucks, <u>Akilu v.
Starbucks</u>, a decision by the Massachusetts Commission Against
Discrimination, is not binding on this court and not persuasive
for the reasons set out by Cairo (Docket Entry # 27, p. 15).

than one sided, a jury could find that availability to work 32 hours a week and 70% of the store's operating hours is not a fundamental requirement of Cairo's position.

Even assuming it was an essential function, a jury could find that Cairo met that requirement with the hours in his restricted schedule.  Cairo's weekly hours of 8:00 a.m. to 9:00 p.m. translate to more than 32 hours a week and more than 70% of the weekly operating hours of the State Street store.  Further, even recognizing that technical compliance with Optimal Scheduling does not equate with true compliance, a jury could still conclude that Cairo's reduced hours complied with the availability "requirements" of Optimal Scheduling.

As to availability to work at least three shifts, the availability form states that "hourly partners" such as baristas, "must be available to work at least three shifts per week or 16 hours/week (for weekend-only partners)."  (Docket Entry # 28-3). Even if such availability is an essential function, the start time of the midday shift is a materially disputed fact.  A jury could find that it started at 10:30 a.m. or 11:00 a.m. and, as a result, Cairo's restricted schedule would allow him to perform this function.

Finally, Starbucks insists that "the key legal questions in this case" include "whether working the opening and/or closing shifts was an essential function of Plaintiff's job."  (Docket

Entry # 29).  It asserts that, "What constitutes an essential function of the job" is "precisely the type[] of legal question[] that should be decided by the Court at summary judgment." (Docket Entry # 29).  The First Circuit in Richardson, however, disagrees and explains that, "the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis." Richardson v. Friendly Ice Cream Corp., 594 F.3d at 75.

    B.  Reasonable Accommodation

    Assuming that availability to work the opening and the closing shifts and that conforming to the availability requirements of Optimal Scheduling were essential functions that Cairo could not perform, the issue devolves to "whether any reasonable accommodation by [the] employer would allow [the plaintiff] to perform" those essential functions.  Phelps v. Optima Health, Inc., 251 F.3d at 25.  The plaintiff "bears the burden of proving that a 'proposed accommodation would enable [him] to perform the essential functions of [his] job' and that, 'at least on the face of things, [the accommodation] is feasible for the employer under the circumstances.'"  Richardson v. Friendly Ice Cream Corp., 594 F.3d at 81 (quoting Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 136 (1st Cir. 2009)).

    In opposing summary judgment, Cairo submits that Starbucks could have accommodated the restricted hours by modifying his

26

schedule to conform to the 8:00 a.m. to 9:00 p.m. restriction.
"A reasonable accommodation" is one that "'enable[s] a qualified
individual with a disability to perform the essential functions
of [his] position.'"  Ward v. Massachusetts Health Research
Institute, Inc., 209 F.3d at 36 (quoting 29 C.F.R. §
1630.2(o)(ii)).  The ADA expressly provides that "'modified work
schedules' are potential reasonable accommodations."[17]  Id.
(quoting 42 U.S.C. § 12111(9)).

In the context of a request for a leave of absence, one
factor to consider is whether the employee specified a return
date or simply sought "'an open ended or indefinite leave
extension.'"  Henry v. United Bank, 686 F.3d at 60 (discussing
chapter 151B claims and quoting Russell v. Cooley Dickinson
Hosp., Inc., 772 N.E.2d at 1064) (ellipses omitted); Garcia-Ayala
v. Lederle Parenterals, Inc., 212 F.3d 638, 650 (1ˢᵗ Cir. 2000)
(factors to consider in ADA claim "as to whether requests for
leaves of absence are unreasonable include" whether employee gave
"indication as to when she might be able to return").  "'A
request for a limited extension, setting a more definite time for
the employee's return to work, may constitute a reasonable

_____

[17]  "A plaintiff must explicitly request an accommodation,
unless the employer otherwise knew one was needed."  Jones v.
Nationwide Life Ins. Co., 696 F.3d at 89.  Starbucks does not
argue that Cairo did not make a request.  In any event, a finder
of fact could conclude that Tam knew that Cairo was prone to
seizures and needed the restricted hours set out in the January
26, 2009 note for a temporary period of one month.

accommodation based on the circumstances'" whereas "'an open-ended or indefinite leave extension' does not constitute a reasonable accommodation." <u>Henry v. United Bank</u>, 686 F.3d at 60 (discussing chapter 151B claims and quoting <u>Russell v. Cooley Dickinson Hosp., Inc.</u>, 772 N.E.2d at 1064).  By analogy, a reasonable jury could find that a modified schedule to start one of the opening shifts at 8:00 a.m. for a more than likely temporary period of one month[18] constitutes a reasonable accommodation.  Starbucks' argument that it was required to give Cairo an indefinite leave of absence does not conform to the factual record when it is viewed in Cairo's favor.  In addition, the fact that Tam informed Cairo that he could reapply for the position is not necessarily a reasonable accommodation.

As to feasibility, Optimal Scheduling provides the means to fix or lock in Cairo's hours for the opening shift.  The computer system will then "build an optimized schedule around that fixed framework that best matches business and partner need for partners whose shifts were not fixed."  (Docket Entry # 28-2). On its face, Cairo provides sufficient evidence that the

---

[18]  The fact that Cairo did not produce a doctor's note does not prevent Cairo from providing other evidence that the requested accommodation was temporary in nature.  Cairo informed Tam on more than one occasion that the restriction was temporary. A jury could also find that Cairo only informed Tam that he could not provide a new note regarding the restrictions in the former note, i.e., the limited hours of 8:00 a.m. to 9:00 p.m. and lifting no more than 50 pounds.

accommodation is feasible.

Starbucks nevertheless argues that it was not required to create a new shift for Cairo.  It is true that, "An employer is not required by the ADA to create a new job for an employee." Phelps v. Optima Health, Inc., 251 F.3d at 27.  It is also not required "to reallocate essential functions to other employees." Id. at 26.  The ADA "'does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous.'"  Richardson v. Friendly Ice Cream Corp., 594 F.3d at 81 (quoting Mulloy, 460 F.3d at 153) (internal quotation marks and citations omitted).

A jury however could conclude that Tam was not creating a new job.  Rather, she would be using the flexibility of Optimal Scheduling to shift hours for a limited period of time.  In addition, scheduling three baristas to open the store and staggering Cairo's start time for the discrete time period of one month does not as a matter of law make the jobs of the other two baristas more onerous.

The same reasoning applies to the essential function of availability to work 32 hours a week and 70% of the store's operating hours.  Optimal Scheduling provides a feasible and flexible means to accommodate the restrictions posed by the 8:00 a.m. to 9:00 p.m. availability.

Starbucks also submits that it was not under an obligation to reassign the shifts of the senior baristas.  Subject to limited exceptions, "a seniority system will prevail over an accommodations request that conflicts with the system's rules." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 137 (1st Cir. 2009) (discussing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 394 & 404 (2002)).  Moreover, an established seniority system retains protection even if it was unilaterally imposed by the employer as opposed to the product of a collective bargaining process.  See U.S. Airways, Inc. v. Barnett, 535 U.S. at 404 & 406.

Cairo, however, was not seeking to replace or bump these baristas from their midday shifts.  He was seeking a modified or adjusted schedule to accommodate his disability for a time period that more than likely was one month.  In addition, as argued by Cairo, the record does not establish as a matter of law that Starbucks had an established seniority system for its baristas guaranteeing certain shifts.  See generally Davidson v. America Online, Inc., 337 F.3d 1179, 1192 n.5 (10th Cir. 2003) (rejecting "AOL's contention that its hiring policy is part of an established seniority system entitled to deference under [Barnett] in the absence of any evidentiary support for this claim").  To the contrary, Optimal Scheduling allowed for flexibility in the shifts that the partners worked and, charitably viewed in Cairo's favor, runs counter to setting aside

30

certain designated shifts for senior baristas.

In short, summary judgment on the basis of reasonable accommodation is not warranted.  It is therefore not necessary to address Cairo's additional argument concerning a transfer to another store as a reasonable accommodation.

C.  Discharge Because of Disability

As a final argument, Starbucks contends that it articulated a legitimate business reason for the termination, namely, Cairo's lack of availability for either the opening or the closing shift.  Cairo maintains there is sufficient evidence of pretext and that the real reason was because of his disability.

Where the employee establishes a prima facie reasonable accommodation claim, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason." Rios-Jimenez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008) (addressing disability discrimination claim and failure to accommodate claim).  "If the defendant is able to offer such a reason, the burden then shifts back to [the plaintiff] to establish that the proffered reason is pretext intended to conceal discriminatory intent." Id.  The ultimate burden of proving that the discharge was in whole or in part because of his disability remains at all times with the plaintiff.  See id. ("ultimate burden of proving unlawful action

rests at all times with [the plaintiff]"); see also Jones v.
Nationwide Life Ins. Co., 696 F.3d at 86 (under ADA, the
plaintiff must show he "was discharged or otherwise adversely
affected in whole or in part because of his disability"); Jones
v. Nationwide Life Ins. Co., 696 F.3d at 86 (the plaintiff must
show he "was discharged or otherwise adversely affected in whole
or in part because of his disability"); Jones v. Walgreen Co.,
679 F.3d at 14.

Starbucks provides a legitimate reason for the termination.
The State Street store needed to fill the opening and the closing
shifts and Cairo was not available to work a full shift.  He
could not open the store at 5:45 a.m. and he could not stay at
the store to the conclusion of the closing shift at 9:15 p.m.

Cairo however provides sufficient evidence to show that the
real reason was because of his disability.  Starbucks had a
policy that required a store manager to "contact partner
resources if an employee needs an accommodation due to a
disability."  (Docket Entry # 28-4, p. 85).  Tam did not contact
partner resources.  Instead, she terminated Cairo's employment
before providing him adequate time to obtain a note demonstrating
that the restriction was temporary.  She also testified that,
"Just because someone can't open and close a store doesn't mean
that they can't be a barista."  (Docket Entry # 28-4, p. 97).
Other evidence in the summary judgment record lends additional

support to a finding that Starbucks terminated Cairo because of his disability.  Thus, even taking into consideration that Starbucks terminated another State Street store partner due to inadequate availability two months before terminating Cairo, the record provides sufficient evidence for a jury to find that Starbucks terminated Cairo in whole or in part because of his disability.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[19] that the motion for summary judgment (Docket Entry # 19) be **DENIED**.


　　　　　　　　　　　　 /s/ Marianne B. Bowler
　　　　　　　　　　　　 **MARIANNE B. BOWLER**
　　　　　　　　　　　　 United States Magistrate Judge


---

[19] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  See Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.